885 So.2d 1023 (2004)
Randy G. ALPHA, Sr., Appellant/Cross-Appellee,
v.
Elizabeth M. ALPHA, Appellee/Cross-Appellant.
No. 5D03-1013.
District Court of Appeal of Florida, Fifth District.
November 5, 2004.
*1025 Elizabeth Siano-Harris of Stadler & Harris, P.A., Titusville, for Appellant/Cross-Appellee.
Stephen M. Brewer of Stephen M. Brewer, P.A., Titusville, for Appellee/Cross-Appellant.
SHARP, W., J.
Randy Alpha, the former husband, appeals from a final judgment of dissolution, raising numerous grounds: the trial court erred in not making findings concerning the identity of the parties' marital and non-marital assets, and their values as required by section 61.075(3)(a-d); the trial court erred in awarding the former wife, Elizabeth Alpha, rehabilitative alimony in the amount of $350.00 per month for a period of four years; it was error to require Randy to maintain life insurance in the sum of $250,000.00 to secure the award of alimony, and that it was also error to require him to maintain $75,000.00 in life insurance to secure the award of child support for the parties' minor daughter, naming Elizabeth as beneficiary; the trial court erred in awarding Elizabeth $6,570.97 towards her attorney's fees and costs, which totaled $13,141.95; and the trial court erred in valuing Randy's insurance business at $200,000.00, and in finding it was totally a marital asset subject to equitable distribution.
In turn, Elizabeth cross-appeals on the following grounds: she should have been awarded a larger amount of rehabilitative alimony or permanent periodic alimony and she should have been awarded 100% of her attorney's fees because of the great disparity in the parties' ability to earn income.
This case touches on a large number of family law issues and we compliment both attorneys and the trial judge for their competent and professional handling of this case. We affirm the equitable distribution *1026 of the parties' marital assets, which was basically 50/50. We remand the alimony award for further findings and consideration by the trial judge. We reverse the partial attorney's fee award for the former wife, finding she should have been awarded the full amount of her fees and costs.
The record establishes that the parties married on March 17, 1989. It was a second marriage for Randy, a first for Elizabeth. One daughter was born in 1993. Elizabeth filed for a dissolution on October 15, 2001, although the parties continued to share the marital residence during the pendency of this suit. Theirs was an approximately twelve and one-half year marriage.
At the time of the dissolution, Randy was 50 years of age and had worked both prior to the marriage and thereafter for Allstate Insurance Company. After the parties married, Randy opened his own insurance agency in Titusville. He asked Elizabeth to obtain two insurance licenses so that she could work in his office. At that point in time, he could not afford to pay anyone else to work for him. She did so, for a number of years, and was paid $1.50 per hour, for the purpose of obtaining workers' compensation insurance.
Elizabeth worked in his office full time until the parties' daughter was born. She quit for a while and then worked part time in the office until 1995, when Randy acquired a partner. Throughout the marriage, Randy built up his insurance business and in the past several years made in excess of $100,000.00 per year. The trial court found, based on Randy's financial affidavit filed in the court, that he has a net monthly income of $5,995.42.
At the time the parties married, Elizabeth was twenty years old and at the time of the dissolution she was thirty-four.[1] When the parties met, Elizabeth was working full time in the Allstate Insurance Office in St. Petersburg, Florida, and was attending a junior college. It was her goal to earn a four-year degree and become a social worker. After the marriage, she moved to Titusville and worked in her husband's new business. However, she continued to attend a community college and earned her two-year degree in 1991. She then began attending UCF and completed twelve credits, prior to the birth of her daughter. When she stopped working part time for her husband, she became a full time homemaker and engaged in many activities with her child, including the BCC Lab School.
Randy commented that Elizabeth was working for free as a volunteer and that she might as well get a paying job. She then became employed part time at Target and more recently she worked as a passenger representative for Walt Disney World at Port Canaveral, earning $6.79 per hour for fifteen hours a week. After filing the suit for dissolution, Elizabeth continued her studies at UCF, with the goal of earning her four-year degree to become a social worker. Based on her financial affidavit submitted at the trial, her net earnings were $303.40 per month.
Prior to the trial, the parties settled numerous issues and entered into a stipulation which the court accepted and implemented, attaching the schedule of division and valuation of the parties' personal and intangible property to the dissolution judgment. These resolved issues were: primary custody of the daughter to Elizabeth; visitation; child support; allocation of the *1027 tax exemption; health insurance for the child; distribution of the marital residence to Randy with a $20,000.00 payment to Elizabeth to compensate her for one-half the value of the equity; distribution of the parties' respective automobiles; distribution of all the parties' financial accounts and retirement plans; and most of the items of personal property in the marital home. Left for trial were issues pertaining to an award of alimony, classification of a 2.9 acre tract of unimproved land in Georgia (marital or not marital), the valuation and nature (marital or not marital) of Randy's insurance business, and an award of attorney's fees and costs to Elizabeth.

I. Failure of the Trial Court to Make Findings Required by Section 61.075(3).

Section 61.075(3) provides that prior to other determinations such as awarding or denying alimony, the trial court should determine which assets and liabilities are non-marital or marital, value them, and designate which spouse is entitled to distribution of each asset, supported by fact findings. This court has held in many cases, that unless the trial court makes the findings required by section 61.075(3) as well as those outlined in section 61.08(2), in granting or denying alimony awards, appellate review is defeated, and we must reverse and remand for the appropriate findings. However, more recently this court retreated from that position where the record is sufficient for us to determine that the evidence supports the trial court's rulings, and where the parties fail to request specific findings either at the trial, or on motion for rehearing.[2]
In this case, the parties stipulated as to how a majority of their marital assets should be distributed and to their values. Neither party requested specific findings in this regard at trial or on rehearing. Further, as to the stipulated items, it is questionable whether specific fact findings are required because section 61.075(3) states it is applicable: "[i]n any contested dissolution action wherein a stipulation and agreement has not been entered and filed...."[3] (Emphasis supplied)
As indicated by the stipulation, it appears the parties agreed to divide their marital assets roughly 50/50. Randy received the marital residence, but he was required to pay Elizabeth $20,000.00, for one-half of the equity in the home, at a time in the future not specified. Each received his or her own vehicles of roughly equal values ($18,000.00 for Randy and $15,000.00 for Elizabeth). Randy received all the funds he had in First Union at the time of the filing of the dissolution and Elizabeth retained the funds she received from the sale of her Disney stock and Allstate Annuity (minimal amounts). Each received one-half of Randy's Allstate Retirement acquired during the marriage and Elizabeth received one-half of the listed stocks and mutual fund assets, less a percentage of their value to account for Randy's pre-marital funds. This resulted in a total distribution of $55,110.00 to Elizabeth. Randy received the balance: $38,831.98 pre-marital, plus $55,110.00 marital. The court also split the IRS refund equally between the parties, as they had agreed ($2,740.00 to each). Failure to make specific findings with regard to these assets is not error in this case.
The parties also agreed to the disposition of their personal property, except for two items: a grandfather clock and a Newton *1028 painting. The court awarded the clock to Randy and the painting to Elizabeth. The schedule of the personal property and values is attached to the final judgment. Although the items are numerous, few are valued at $500.00, and most are less. Since both parties agreed to the division and their valuation, we can assume it was roughly equal. Even if separated out and added to the parties' asset columns, these values would have little or no effect on the ascertainment of the parties' financial situations, post-dissolution, since they are not income-producing and the parties intended to keep and use them in setting up their separate households. Failure to make specific findings with regard to these assets is not error in this case.
With regard to the two disputed items, the Georgia property and Randy's insurance business, sufficient evidence was presented to support the trial court's findings that both were marital assets. It made specific findings that they were marital, placed a value on each, and made a 50/50 division of each, as required by section 61.075.
In the final judgment, the court set forth its findings as to why it ruled the Georgia property was a marital asset. Although the property had been owned by Randy before the parties married, in 1993 he directed an attorney to put the property jointly in his and Elizabeth's names. The express wording on the document indicated the consideration for the transfer was a "deed of gift." Elizabeth testified it was a gift to her and that the parties had planned to build cabins on the property for themselves and Elizabeth's parents when Randy retired. Randy testified the deed was executed for estate planning purposes and no gift was intended. However, the trial court found Randy's testimony was insufficient to overcome the express terms of the deed. Thus, pursuant to section 61.075(5)(a)3, the court found it was a marital asset.
The Georgia property was awarded to Randy, but he was required to pay Elizabeth $6,250.00 for her half-interest, within thirty days of the final judgment. The valuation of this property at $12,500.00 was supported by an appraisal admitted in evidence at the trial. Neither party disputed its accuracy.
The court also set out findings as to why it considered Randy's insurance business to be a marital asset, based on testimony presented at the trial. Both parties agreed that when the former husband began working for Allstate in 1981, he was merely an employee and had no ability to sell his "book of business," (basically his ability to sell his right to earned premiums on policies he sold). After he opened his own insurance business in Titusville with the assistance of Elizabeth, he could have sold his book of business to a buyer approved by Allstate.
However, in July of 2000, Allstate forced him to elect between options of selling his business in a short period of time to an Allstate approved buyer, being terminated, or entering into a two-year contract as a new exclusive agent. Pursuant to the contract, after a two-year period, if he was not terminated before its end, Randy again would be able to sell his entire book of business. Also, during the term of the two years, he would only be able to sell the book of business he accrued during that two-year period. He elected this later option, and formed a corporation to execute the contract with Allstate. He owned 90% of the stock and Elizabeth owned 10%. At the time of the trial, the two-year period had passed, but at the time Elizabeth filed for a dissolution the two years had less than one year to run.
The expert witness for Randy testified that on October 1, 2001, the date the petition *1029 for dissolution was filed, the book of business Randy could sell was worth between $17,600.00 to $23,500.00, based on policies generated during the two-year period. However, he testified the value on the date of the trial was between $209,400.00 and $279,000.00, based on what a willing buyer in the insurance business would pay for this business. The court also considered the fact that within the two-year period, Randy had advertised his and his partner's insurance business for sale at $630,000.00, a somewhat "exaggerated" value, Randy testified. Randy owned 56% of the business and the balance was owned by his partner.
Elizabeth's expert witness testified he used a net income analysis basis (i.e., the fact that Randy was earning in the range of $100,000.00 per year) in determining Randy's business was worth $220,000.00 at the time of the trial, as well as on the date Elizabeth filed for dissolution. He did not consider the two-year contract with Allstate because, he explained, it was improper to base a valuation on contingencies which had not occurred.[4]
The trial court determined that the insurance business was worth $200,000.00. Randy argues on appeal that there is no basis in this record for that valuation. However, it is close to the value arrived at by Randy's expert had Randy's expert disregarded the two-year contract that both created the possibility of selling his complete book of business and required a two-year waiting period. The trial court could also have properly discounted the values arrived at by Elizabeth's expert due to the limitations and difficulties Randy testified about, even after the two-year period expired, that he would experience by having to sell his business to a buyer approved by Allstate, and that he would continue to remain subject to a ninety-day termination period, during which he would have to find such a buyer or suffer a small termination payout, based only on business generated after July 2000. These requirements continued as part of his corporation's arrangement with Allstate. We find no error with regard to the valuation of Randy's insurance business.[5]
Randy also argues that the trial court erred in not finding that part of his business was pre-marital, since his book of business commenced in 1981. He testified that in 1981 he was servicing 2,039 policies, and that he is currently servicing 2,430 policies. Thus, he reasoned 96% of the business should be deemed pre-marital. The trial court did not expressly address this issue in the final judgment, finding that the whole of the book of business was a marital asset. Resolution of credibility issues is the trial court's function.[6] Had Randy only written 391 policies since 1989, it is doubtful he would still be working for Allstate. Accordingly, the trial court awarded Elizabeth $100,000.00, one-half share of the value of the business, payable within eighteen months, after the final judgment.
This finding has support in the evidence based on the fact that Randy's expert admitted he had not looked at the policies written prior to the parties' marriage in 1989 and compared them with the ones being serviced in 2001. The Allstate exhibits at trial which report Randy's insurance business, indicate that in 1989 the *1030 total earned premiums for all kinds of insurance policies written by Randy, commencing in 1981 through 1989, was $801,291. In 2001, the total was $1,400,911.84. This indicts a substantial increase in Randy's business during the period of the party's marriage, but it also does not show which, if any, of those policies being served in 2001 pertain to policies written prior to 1989. The burden of establishing that an asset is non-marital is on the party claiming it to be so.[7]
Thus, the equitable distribution of marital and non-marital assets, based on the record, was as follows:

 Former Former
 Asset Husband Wife
 ----- ----------- -----------
 Residence $ 20,000.00 $ 20,000.00
 Vehicles 1,000.00 15,000.00
 18,000.00
 Funds and
 Investments 97,585.16 55,110.00
 IRS Refund 2,740.00 2,740.00
 Georgia Property 6,250.00 6,250.00
 Insurance Business 100,000.00 100,000.00
 __________ __________
 TOTAL $ 245,575.16 $ 199,090.00

Considering both the parties' assets which they deemed marital and the assets they agreed were non-marital (the $42,000.00 in investments and accounts and their undisputed values), the insurance business and the Georgia property which the court found was marital property and the values the court determined based on disputed evidence of the value of the business and the undisputed evidence as regards the Georgia property, it appears the court roughly equally divided the parties' marital property. Given the length of the parties' marriage and the contributions of Elizabeth to the marriage,[8] we find no abuse of the court's discretion in taking this first step in resolving this case, as to the equitable distribution of the marital assets.[9]

II. Alimony Award.

Neither party comes to this court content with the trial court's determination that Elizabeth is entitled to rehabilitative alimony in the amount of $350.00 per month for four years. Randy argues that because Elizabeth holds two insurance licenses and can obtain employment in the insurance business which could eventually pay her as much or more than she can earn in social work, her plan to obtain a four year college degree and qualify herself to become employed by the state as a social worker is flawed and in addition, she failed to present sufficient specific evidence at the trial to justify the amount awarded, as well as the length of time needed to earn her degree. Elizabeth contends she should have been awarded permanent alimony and that the rehabilitative alimony award is too meager to enable her to achieve her goal.
At the trial, Elizabeth testified that when the parties married she was working in an Allstate office in St. Petersburg, Florida, supporting herself, earning $6.85 per hour. She was also attending a junior college with the goal of obtaining a four-year degree so that she could become a social worker, having done an internship with HRS. She did not want to work in the insurance business, but after the parties married and moved to Titusville, at her *1031 husband's request, and because he could not afford to pay an office worker, she obtained two different insurance licenses and worked with him to establish the agency business. However, she also continued to pursue her goal of obtaining a four-year degree, taking classes at a community college and obtaining an AA degree in 1992.
She then commenced classes at UCF and earned additional credits. At the time of the dissolution hearing, she needed an additional 42 credits to obtain her four-year degree. She testified that she had started taking classes at UCF after filing the petition for dissolution. It was still her goal to graduate with a four-year degree. She stated that it would take her three and one-half years to obtain that goal and the cost of tuition and books would be $700.00 per semester. Her four-year degree would enable her to earn $25,000.00 to $30,000.00 at an entry level job, in the field of social work. This would be more income than she had ever earned in her life.
She estimated that her living expenses, residing with her daughter in a new, smaller home, would be $3,898.67 per month, that her net income from part-time employment would be $303.40. She also testified that she would have to obtain health insurance for herself at $212.00 per month and that if she had to work full time, she would need an additional $120.00 per month for extended child care for the parties' daughter.
The court made some findings regarding rehabilitative alimony which tend to support its award. It found Elizabeth is presently attending UCF and needs 44 credits to complete her four-year degree, that she normally takes six hours per semester, and that she estimates it will take her four to five years to obtain her degree. It also found that Elizabeth has sought consistently during the marriage to obtain a four-year degree, with the same goal in mind. The court also found that her net monthly income is $303.40 and that Randy's net monthly income is $5,995.42.
A court has broad discretion in determining alimony awards, which unlike child support awards, have no guidelines, although they are limited by what is rational and supported by the evidence. For marriages with the duration of approximately twelve years, like the one in this case, courts say this is in the upper range of the "gray area" where there is no presumption for or against an award of permanent alimony. Both rehabilitative and permanent alimony awards are appropriate.[10] In such cases, findings to support alimony awards or the denial of them, are essential in order to permit meaningful appellate review.
The transition from being primarily a housewife and childcare giver, to becoming self-supporting, as a matter of common sense and practicality, cannot be expected to occur overnight. Randy, at the dissolution trial, agreed that a temporary award to Elizabeth would be "okay." And, at the hearing held on the parties' motions for rehearing, counsel for Randy agreed that rehabilitative alimony was appropriate, "given all the factors." Although this court has not looked kindly on "bridge the gap" rehabilitative alimony awards in the past,[11] in a proper case, it might do so in *1032 the future.[12]
In this case, however, the traditional concept of an award of rehabilitative alimony appears plausible[13] and the court made sufficient fact findings to support a rehabilitative award. The former wife is relatively young and in good health and has been actively pursuing her four-year degree prior to and during the marriage. She was enrolled in UCF at the time of the dissolution, with the same goal in mind. She testified specifically as to the time needed and the cost of tuition and books to obtain her degree and that it would enhance her earning ability to a degree far above anything she had ever earned before, all of which the court incorporated in its final judgment.
Randy's argument that Elizabeth could earn more working in an insurance agency office at a job she never wanted, so rehabilitation was not required, was rejected by the trial court. In answer to this argument, the court said that a person with a four year college degree has far better earning prospects than one who lacks one, in whatever field Elizabeth chose to work in the future. We agree. Elizabeth should be permitted to follow her chosen career rather than one that was tolerated in order to provide support to Randy in starting his insurance business. See Short v. Short, 747 So.2d 411 (Fla. 5th DCA 1999).
However, we regret the absence of fact findings in this dissolution judgment that prevents us from addressing the propriety of the amount awarded as rehabilitative alimony.[14] The $350.00 per month award over a period of four years exceeds the sum Elizabeth testified she needed for college expenses.[15] But, in order to attend UCF and thus work only part time, is the $350.00 per month sum adequate to enable her to pay her living expenses?
The trial court may have imputed additional income to Elizabeth in order to conclude she would be able to support herself and attend college over that four-year span, with an award of only $350.00 per month. It made no findings in this regard, which was erroneous.[16] It found that she was earning a minimal amount ($303.00 per month), which combined with the award of rehabilitative alimony, totals $653.00 per month. That does not appear to be a sufficient amount to enable her to reach her educational goal.[17]
Nor does the potential income from her share of the marital assets appear sufficient for this purpose. A spouse should not be required to consume his or her share of marital assets received from equitable distribution as a means of support, if the other spouse has the ability to assist.[18] The rehabilitative alimony award should be sufficient to furnish both college expenses per se, and cost of living support over the required time to permit the recipient spouse to attend the educational institution.[19]
*1033 Further, the trial court made no express findings as to why it determined that permanent alimony for Elizabeth was inappropriate. It simply said that it was. In similar cases, permanent alimony has been awarded, based on a level of support sufficient to maintain the stay-at-home spouse near the marital standard of living.[20] However, there are facts in this case which could support a denial of a permanent alimony award: Elizabeth is relatively young in comparison to her former husband; she is in good health; and she is highly motivated to take her place in the ranks of the better-employed. On remand, the trial court should also make appropriate findings to support its conclusion that permanent alimony is inappropriate.[21]

III. Life Insurance as Security for the Alimony and the Child Support Awards.

The trial court ordered the former husband to maintain the term portion of a $500,000.00 life insurance policy on his life in the amount of at least $250,000.00 for the benefit of the former wife, to secure his alimony obligation. It also found that the cost was "not prohibitive." The court also required the former husband to maintain a $75,000.00 life insurance policy on his life to secure his child support obligation and to name the former wife as irrevocable beneficiary for the minor child.
Courts may require that child support and alimony awards be secured by life insurance on the life of the obligor.[22] However, they require that there be evidence in the record and findings by the court as to the cost of the insurance being required, in order to establish that the obligor can obtain and afford such insurance coverage. In addition, in order to uphold requirements of life insurance as security for awards, reviewing courts require that there be special circumstances which justify a need for such requirements. In this case, the trial court made almost no findings on any of these matters other than that the cost was "not prohibitive."
The testimony at trial regarding life insurance was very sparse. Randy testified that he currently had a total of estified that he currently had a total of $750,000.00 in life insurance and that his business paid the premiums for him. He estimated the cost for the several policies at $300.00 per month. For his $500,000.00 term life insurance policy, he estimated the cost at $190.00 per month. During her testimony, Elizabeth merely stated that she wanted the court to order Randy to maintain life insurance to secure her alimony award, but she gave no reason why there were special needs or considerations.
We conclude that testimony in the record supports the trial court's conclusion that the former husband has life insurance in the amount being required and that the cost is clearly affordable, given his net income and the fact that his business is paying the premiums in addition to his salary. However, the trial court's failure to make findings as to special circumstances or needs for securing either the child support or alimony award and in the *1034 amounts being required, is error. On remand, the trial court must drop these insurance-as-security requirements, or make sufficient fact findings based on the record, to facilitate appellate review of these issues.[23] Such special circumstances include a spouse potentially left in dire financial straits after the death of the obligor spouse due to age, ill health and/or lack of employment skills,[24] obligor spouse in poor health, minors living at home, supported spouse with limited earning capacity, obligor spouse in arrears on support obligations,[25] and cases where the obligor spouse agreed on the record to secure an award with a life insurance policy.[26] It appears in this case that Elizabeth may have a greater need for life insurance to secure her share of the equitable distribution of the insurance business, which she was not to receive for eighteen months.
In any event, should the trial court determine, on remand, that there are special circumstances in this case justifying the requirement of life insurance to secure the child support award, we point out that it is error to name the former wife as the irrevocable beneficiary of the life insurance securing child support.[27]

III. Attorney Fees and Costs.

The trial judge awarded Elizabeth one-half of her attorney's fees and costs, $6,570.00. Orally, the judge complimented both attorneys for the professional manner in which the litigation had been handled and it expressly determined that Elizabeth's attorney's fees were reasonable and well earned, as to rate and time expended.[28] Randy argues that no attorney's fees and costs should have been awarded based on his superior income earning abilities, and Elizabeth argues Randy should have been required to pay all of her fees and costs, based on the parties' disparate incomes.
The trial judge stated orally that the attorney's fee award was based on the former husband's superior financial ability to pay, due to his relatively much greater income. As noted above, the court found his net monthly earned income was almost $6,000.00, and the former wife's was $303.40. Including the alimony award, her post-judgment income was $653.00. This is a considerable disparity.
The trial judge also stated orally that after the equitable distribution of the parties' marital assets, the two parties were not in equal financial positions. Although Elizabeth was allocated some assets after equitable distribution, they were not sufficient to provide her with an income sufficient to make her financial situation comparable to Randy's.[29] The *1035 court's equitable distribution gave Randy the income-earning business and Elizabeth a promise of a payout in eighteen months. However, due to the fact that she received some liquid assets by way of equitable distribution, the court must have reasoned that she has some ability to pay her own fees.
Based on our review of the record and the trial court's oral statements on the record, we conclude that the court abused its discretion in not awarding the former wife all of her attorney's fees in this case. See Ondrejack v. Ondrejack, 839 So.2d 867 (Fla. 4th DCA 2003); Akers v. Akers, 518 So.2d 292 (Fla. 5th DCA 1987). In order to pay her attorney's fees the former wife will be required to expend the principal of her assets obtained from equitable distribution. This result is inequitable because the marital assets allocated to her are not substantial and the former husband has a far greater income and ability to pay. See Hill v. Hooten, 776 So.2d 1004 (Fla. 5th DCA 2001); Flemming v. Flemming, 742 So.2d 843 (Fla. 1st DCA 1999).

Conclusion.
We affirm the lower court's judgment in regards to the valuation of the marital assets and the determination of their marital status and equitable distribution. However, we remand this cause to the trial court for additional findings regarding the amount of rehabilitative alimony awarded, the denial of permanent alimony and the necessity vel non for life insurance to secure the alimony and child support award. We also direct that the former wife be awarded the full amount of her attorney's fees and costs. To do justice to the parties, the court may also consider delaying and making periodic the payout to the former wife for her interest in the insurance business and securing it with life insurance. See Makowski v. Makowski, 613 So.2d 924 (Fla. 3d DCA 1993).
AFFIRMED, in part; REVERSED and REMANDED in part.
GRIFFIN and ORFINGER, JJ., concur.
NOTES
[1] The parties were married March 17, 1989 and Elizabeth filed her petition for dissolution on October 15, 2001.
[2] Mathieu v. Mathieu, 877 So.2d 740 (Fla. 5th DCA 2004); Killius v. Killius, 701 So.2d 1245 (Fla. 5th DCA 1997). See also Broadfoot v. Broadfoot, 791 So.2d 584 (Fla. 3d DCA 2001).
[3] See Vick v. Vick, 675 So.2d 714 (Fla. 5th DCA 1996).
[4] Florida law holds otherwise. See § 61.075, Fla. Stat.; Ruberg v. Ruberg, 858 So.2d 1147 (Fla. 2d DCA 2003); Jensen v. Jensen, 824 So.2d 315 (Fla. 1st DCA 2002); Vaccaro v. Vaccaro, 677 So.2d 918 (Fla. 5th DCA 1996).
[5] See Makowski v. Makowski, 613 So.2d 924 (Fla. 3d DCA 1993).
[6] See Bijlani v. Pioneer House Associates, 719 So.2d 377 (Fla. 3d DCA 1998); Ferry v. Abrams, 679 So.2d 80 (Fla. 5th DCA 1996).
[7] See § 61.075(7), Fla. Stat.; Robertson v. Robertson, 593 So.2d 491 (Fla.1991); Dal Ponte v. Dal Ponte, 692 So.2d 283 (Fla. 1st DCA 1997); Livingston v. Livingston, 633 So.2d 1162 (Fla. 1st DCA 1994); Howes v. Howes, 613 So.2d 551 (Fla. 4th DCA 1993).
[8] The court expressly found Elizabeth's contributions were undisputed as to the marriage through her efforts of working in Randy's office for five years with little or no pay and, part time, until 1995 and thereafter devoting herself to caring for the parties' child, school and homemaking.
[9] § 61.075(1) and (8), Fla. Stat.
[10] See Martinez v. Martinez, 761 So.2d 433 (Fla. 3d DCA 2000); Nelson v. Nelson, 721 So.2d 388 (Fla. 4th DCA 1998); Lynch v. Lynch, 695 So.2d 843 (Fla. 3d DCA 1997); Parker v. Parker, 655 So.2d 233 (Fla. 1st DCA 1995). See also Abrams, I Fla. Family Law, Ch. 31.05(2)(c).
[11] See Calderon v. Calderon, 730 So.2d 400 (Fla. 5th DCA 1999); Ingle v. Ingle, 640 So.2d 223, 224 (Fla. 5th DCA 1994); Martin v. Martin, 582 So.2d 784 (Fla. 5th DCA 1991); Kirchman v. Kirchman, 389 So.2d 327 (Fla. 5th DCA 1980). See also Abrams, I Fla. Family Law, Ch. 31.04(1)(b).
[12] See Vick v. Vick, 675 So.2d 714, 717 (Fla. 5th DCA 1996).
[13] See Layeni v. Layeni, 843 So.2d 295 (Fla. 5th DCA 2003).
[14] See McCarty v. McCarty, 710 So.2d 713 (Fla. 1st DCA 1998).
[15] Two semesters per year, over four years at $700 per year, totals $5,600.00.
[16] See Walker v. Walker, 818 So.2d 711 (Fla. 2d DCA 2002); Vitalis v. Vitalis, 799 So.2d 1127 (Fla. 5th DCA 2001); Vick v. Vick, 675 So.2d 714 (Fla. 5th DCA 1996).
[17] See Frechter v. Frechter, 548 So.2d 712 (Fla. 3d DCA 1989); Rovenger v. Rovenger, 474 So.2d 286 (Fla. 3d DCA 1985).
[18] See Makowski v. Makowski, 613 So.2d 924 (Fla. 3d DCA 1993).
[19] See Short v. Short, 747 So.2d 411 (Fla. 5th DCA 1999); Florida Dissolution of Marriage, § 13.24 (6th ed.2002).
[20] See Levy v. Levy, 862 So.2d 48 (Fla. 3d DCA 2003); Knoff v. Knoff, 751 So.2d 167 (Fla. 2d DCA 2000); Mesa v. Mesa, 652 So.2d 456 (Fla. 4th DCA 1995); Zeigler v. Zeigler, 635 So.2d 50 (Fla. 1st DCA 1994); Gregoire v. Gregoire, 615 So.2d 694 (Fla. 2d DCA 1992).
[21] See Henin v. Henin, 767 So.2d 1284 (Fla. 5th DCA 2000).
[22] See § 61.08(3), Fla. Stat.; Sobelman v. Sobelman, 541 So.2d 1153 (Fla.1989); Richardson v. Richardson, 722 So.2d 280 (Fla. 5th DCA 1998); McDaniel v. McDaniel, 653 So.2d 1076 (Fla. 5th DCA 1995).
[23] See Layeni v. Layeni, 843 So.2d 295 (Fla. 5th DCA 2003); Pinion v. Pinion, 818 So.2d 557 (Fla. 2d DCA 2002); Guerin v. DiRoma, 819 So.2d 968 (Fla. 4th DCA 2002); McDaniel v. McDaniel, 653 So.2d 1076 (Fla. 5th DCA 1995); Frechter v. Frechter, 548 So.2d 712 (Fla. 3d DCA 1989).
[24] Lapham v. Lapham, 778 So.2d 487 (Fla. 5th DCA 2001); Richardson v. Richardson, 722 So.2d 280 (Fla. 5th DCA 1998).
[25] Moorehead v. Moorehead, 745 So.2d 549 (Fla. 4th DCA 1999).
[26] Hill v. Hooten, 776 So.2d 1004 (Fla. 5th DCA 2001).
[27] See Parker v. Parker, 655 So.2d 233 (Fla. 1st DCA 1995); Tassone v. Tassone, 492 So.2d 1086 (Fla. 2d DCA 1986).
[28] The Rowe factors. See Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145, 1151 (Fla.1985), modified by, Standard Guaranty Ins. Co. v. Quanstrom, 555 So.2d 828 (Fla.1990).
[29] Compare Zahringer v. Zahringer, 813 So.2d 181 (Fla. 4th DCA 2002); Morris v. Morris, 743 So.2d 81 (Fla. 5th DCA 1999).